**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**MANHATTAN DIVISION**

TYLER BAKER, WILLIAM DAVIS, BRIAN HUNTING, LOUIS CORVI, CHRISTOPHER HACKETT, and RATIEK LOWERY individually and on behalf of all others similarly situated,

Plaintiffs,

v.

YAHOO INC. and YAHOO AD TECH LLC

Defendants.

Case No. 1:25-cv-2797-DLC

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Hon. Denise L. Cote

Plaintiffs Tyler Baker, William Davis, Brian Hunting, Louis Corvi, Christopher Hackett, and Ratiek Lowery, individually and on behalf of all others similarly situated individuals, assert the following against Defendants Yahoo Inc. and Yahoo Ad Tech LLC (collectively, "Yahoo" or "Defendants") based upon personal knowledge, information and belief (where applicable), and the investigation of counsel.

## SUMMARY OF ALLEGATIONS

1. Many people know Yahoo because it is considered one of the earliest internet companies, which rose to prominence through its email service and search capabilities. Or they know Yahoo because of its two back-to-back data breaches over a decade ago, which compromised the account information of nearly every Yahoo email user.

2. What people don't know is Yahoo does much more than provide an email domain and search features. Starting in the 2000s, Yahoo began acquiring marketing and ad tech companies to develop a user-based targeted advertising business. This began with its acquisition of Right

Media in 2007 and continued through the buyouts of Flurry Analytics and BrightRoll in 2014.

3. These acquisitions were so lucrative that they ultimately led to Yahoo being acquired by Verizon in 2017 for $4.83 billion. Verizon's CEO at the time, Lowell McAdam, said the acquisition of Yahoo "put Verizon in a highly competitive position as a top global mobile media company and help[ed] accelerate [its] revenue stream in digital advertising."

4. Yahoo's value was derived from the new forms of persistent, user-based online tracking it developed through these acquisitions. Specifically, in 2020—after Apple and Google announced they would eventually phase out third-party cookies and Apple would restrict the use of mobile identifiers—Yahoo released a new, unified way to track users across platforms and devices.

5. This solution is called Yahoo ConnectID (formerly known as "Verizon Media Connect ID"), built on Yahoo's Identity Graph. An "identity graph" itself is already lucrative to advertisers, as it is a consolidated dataset containing all known identifiers about a particular consumer, such as IP address and device identifiers. Yahoo executives have acknowledged that both IP addresses and device identifiers are a key part of its strategy for identifying and profiling users.

6. Yahoo's ConnectID, however, is *especially* powerful. Rather than relying exclusively on cookies or mobile identifiers, the Yahoo ConnectID is an email-based persistent identifier. When a user logs in or provides an email (a form of personally identifiable information ("PII")) to an online service offered by Yahoo or one of its partners, Yahoo intercepts and assigns a Yahoo ConnectID to that user based on their email address. This ConnectID serves as the anchor for Yahoo's identity graph, given its consistency and immutable nature.

7. Yahoo promotes this as a "privacy-centric" and "[p]rivacy first" identity solution.

It is anything but. The Yahoo ConnectID is privacy-invasive because it is a work-around to privacy mechanisms designed to prevent this type of user-based tracking. For instance, Safari and Firefox browsers both restrict the use of third-party cookies, but the Yahoo ConnectID defeats these privacy precautions by assigning a persistent identifier directly mapped to PII without the use of traditional third-party cookies. If a user cleared their cookies or other tracking technology on their browser, this would not stop Yahoo because it will simply identify them again the next time they log-in to a website that recognizes ConnectID with their email address.

8. Yahoo itself does not tell individuals about its Yahoo ConnectID or that this identifier is tied directly to their PII. Its Privacy Policy makes no mention of Yahoo ConnectID, and it expressly states that Yahoo does "not share personally identifiable information (like phone number or email address) with . . . partners, such as publishers, advertisers, ad agencies, or analytics partners." This is deceptive. While Yahoo may not disclose email addresses directly, it intercepts and maps them directly to ConnectID, a persistent identifier that it does share with others. This translation is akin to (and no better than) sharing the email address itself.

9. Yahoo's role as a centralized identity broker allows it to uniquely identify individuals and recognize them across websites and devices—exactly what privacy-preserving mechanisms are meant to prevent, and all without user consent. Yahoo has confirmed that, through Yahoo ConnectID, it has successfully identified over ***300 million*** logged-in users.

10. Worse, Yahoo does not simply track identity—it ***profiles*** individuals, a key feature used to fuel its lucrative advertising business. As described herein, Yahoo combines the Yahoo ConnectID with private data it obtains through its apps, websites, and other services—as well as similar private data from its customers/partners—to create comprehensive user profiles. This data comes from: (1) Yahoo owned web properties and those of its subsidiaries, like Flurry, who had a

stronghold on data from "70% of the apps on the average smartphone"; (2) Yahoo's own advertising and analytics solutions, which are incorporated and used by developers and advertisers; (3) Yahoo's machine-learning and AI solutions, which enrich and analyze data to derive even more information about the user; and (4) Yahoo's role as a demand-side platform ("DSP") and supply-side platform ("SSP") in the world of real-time bidding ("RTB"). Yahoo uses this massive pool of profile data to further improve its ability to identify and target unique users with advertisements by updating and improving the models and algorithms that do so.

11. Through Yahoo ConnectID—and complementary products (described briefly above)—Yahoo has been secretly harvesting and monetizing directly identifiable user data from millions of U.S. residents without their knowledge and consent.

12. Yahoo's interception of the contents of individuals' communications with third parties through its tracking technology and installation of a tracking device on each of the websites they use across the internet violates New York's General Business Law, California's Invasion of Privacy Act, as well as other laws.

## PARTIES

### A. Plaintiffs

13. **Plaintiff Tyler Baker** is a resident of Chittenden County, Vermont.

14. Plaintiff Baker has several online accounts at sites that use Yahoo's tracking technology, including accounts with CBS Sports and Walmart.

15. Plaintiff Baker created an initial account with CBS Sports in approximately 2004 and a second account with CBS Sports in approximately 2020. Plaintiff Baker created an account with Walmart in December of 2024. Plaintiff Baker created his 2020 CBS Sports account and Walmart account with non-Yahoo email addresses and does not recall the email address used for

his 2004 CBS Sports account. Plaintiff Baker also has at least two Yahoo email accounts, which he created approximately a decade ago.

16. When Plaintiff Baker visited these websites and logged in with his email address, Yahoo intercepted his email and generated or assigned an existing Yahoo ConnectID.

17. Yahoo used this Yahoo ConnectID—alongside its other ad and analytics technology—to track Plaintiff Baker across the internet and develop a unique user profile. Through this technology, Yahoo intercepted at least: (1) Plaintiff Baker's searches; (2) full-string URLs revealing what Plaintiff Baker was viewing and interacting with on web properties; and (3) IP addresses and unique device identifiers. Yahoo processed this data and stored it on its own servers—alongside Plaintiff Baker's Yahoo ConnectID—for its own benefit and monetary gain. It also used this data for training its machine learning models and algorithms to better target online users.

18. Plaintiff Baker did not consent to Yahoo intercepting his unique identifiers and other personal data, assigning, and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

19. **Plaintiff William Davis** is a resident of San Diego County, California.

20. Plaintiff Davis has several online accounts at sites that use Yahoo's tracking technology, including an account with CBS Sports and an account with Realtor.com.

21. Plaintiff Davis created an initial account with CBS Sports in approximately 2021 and a second account with CBS Sports in May of 2025. He created his account with Realtor.com in approximately 2023. Each of these accounts were created with Plaintiff Davis's Yahoo email addresses. Plaintiff Davis created his Yahoo email accounts in approximately 2013, 2016, 2020

and 2024.

22. When Plaintiff Davis visited these websites and logged in with his email address, Yahoo intercepted his email and assigned or attributed his information to an existing Yahoo ConnectID.

23. Yahoo used this Yahoo ConnectID—alongside its other ad and analytics technology—to track Plaintiff Davis across the internet and develop a unique user profile. Through this technology, Yahoo intercepted at least (1) Plaintiffs Davis's searches; (2) full-string URLs revealing what Plaintiff Davis was viewing and interacting with on web properties; and (3) IP addresses and unique device identifiers. Yahoo processed this data and stored it on its own servers—alongside his Yahoo ConnectID—for its own benefit and monetary gain. It also used this data for training its machine learning models and algorithms to better target online users.

24. Plaintiff Davis did not consent to Yahoo intercepting his unique identifiers and other personal data, assigning, and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

25. **Plaintiff Brian Hunting** is a resident of Sacramento County, California.

26. Plaintiff Hunting has several online accounts at sites that use Yahoo's tracking technology, including an account with CBS Sports and an account with US Magazine.

27. Plaintiff Hunting created his accounts with CBS Sports and US Magazine approximately ten years ago. Each of these accounts were created with Plaintiff Hunting's Yahoo email address, which he created in approximately 2010.

28. When Plaintiff Hunting visited these websites and logged in with his email address, Yahoo intercepted his email and assigned or attributed his information to an existing Yahoo ConnectID.

29. Yahoo used this Yahoo ConnectID—alongside its other ad and analytics technology—to track Plaintiff Hunting across the internet and develop a unique user profile. Through this technology, Yahoo intercepted at least (1) Plaintiff Hunting's searches; (2) full-string URLs revealing what Plaintiff Hunting was viewing and interacting with on web properties; and (3) IP addresses and unique device identifiers. Yahoo processed this data and stored it on its own servers—alongside his Yahoo ConnectID—for its own benefit and monetary gain. It also used this data for training its machine learning models and algorithms to better target online users.

30. Plaintiff Hunting did not consent to Yahoo intercepting his unique identifiers and other personal data, assigning, and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

31. **Plaintiff Louis Corvi** is a resident of San Joaquin County, California.

32. Plaintiff Corvi has an online account with CBS Sports, which he created using his email. CBS Sports uses Yahoo's tracking technology.

33. Plaintiff Corvi created his accounts with CBS Sports in, approximately, September 2021. This account was created with Plaintiff Corvi's Yahoo email address, which he created in approximately 2005.

34. When Plaintiff Corvi visited this website and logged in with his email address, Yahoo intercepted his email and assigned or generated an existing Yahoo ConnectID.

35. Yahoo used this Yahoo ConnectID—alongside its other ad and analytics technology—to track Plaintiff Corvi across the internet and develop a unique user profile. Through this technology, Yahoo intercepted at least: (1) Plaintiff Corvi's searches; (2) full-string URLs revealing what Plaintiff Corvi was viewing and interacting with on web properties; and (3) IP

addresses and unique device identifiers. Yahoo processed this data and stored it on its own servers—alongside his Yahoo ConnectID—for its own benefit and monetary gain. It also used this data for training its machine learning models and algorithms to better target online users.

36. Plaintiff Corvi did not consent to Yahoo intercepting his unique identifiers and other personal data, assigning, and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

37. **Plaintiff Christopher Hackett** is a resident of Los Angeles County, California.

38. Plaintiff Hackett has an online account at Realtor.com, which he created using his email. Realtor.com uses Yahoo's tracking technology.

39. Plaintiff Hackett created his account with Realtor.com in approximately 2018. This account was created with one of Plaintiff Hackett's Yahoo email address, which he created in either the late 1990's or early 2000's.

40. When Plaintiff Hackett visited these websites and logged in with his email address, Yahoo intercepted his email and assigned or generated an existing Yahoo ConnectID.

41. Yahoo used this Yahoo ConnectID—alongside its other ad and analytics technology—to track Plaintiff Hackett across the internet and develop a unique user profile. Through this technology, Yahoo intercepted at least: (1) Plaintiff Hackett's searches; (2) full-string URLs revealing what Plaintiff Hackett was viewing and interacting with on web properties; and (3) IP addresses and unique device identifiers. Yahoo processed this data and stored it on its own servers—alongside his Yahoo ConnectID—for its own benefit and monetary gain. It also used this data for training its machine learning models and algorithms to better target online users.

42. Plaintiff Hackett did not consent to Yahoo intercepting his unique identifiers and other personal data, assigning, and using unique identifiers to track him across internet-enabled

services and devices, or intercepting and using the contents of his private communications for profit.

43. **Plaintiff Ratiek Lowery** is a resident of Queens, New York.

44. Plaintiff Lowery has several online accounts, which he created using his email address, at sites that use Yahoo's tracking technology, including an account with FanDuel.

45. Plaintiff Lowery created his account with FanDuel in approximately 2021, using a non-Yahoo email address. Plaintiff Lowery also has at least one Yahoo email account, which he created in approximately 2022.

46. When Plaintiff Lowery visited these websites and logged in with his email address, Yahoo intercepted his email and assigned or generated an existing Yahoo ConnectID.

47. Yahoo used this Yahoo ConnectID—alongside its other ad and analytics technology—to track Plaintiff Lowery across the internet and develop a unique user profile. Through this technology, Yahoo intercepted at least: (1) Plaintiff Lowery's searches; (2) full-string URLs revealing what Plaintiff Lowery was viewing and interacting with on web properties; and (3) IP addresses and unique device identifiers. Yahoo processed this data and stored it on its own servers—alongside his Yahoo ConnectID—for its own benefit and monetary gain. It also used this data for training its machine learning models and algorithms to better target online users.

48. Plaintiff Lowery did not consent to Yahoo intercepting his unique identifiers and other personal data, assigning, and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

**B. Defendants**

49. **Yahoo Inc.** is a Delaware corporation with its principal place of business located

in New York, New York.

50. **Yahoo Ad Tech LLC** is a Delaware corporation with its principal place of business located in New York, New York.[1]

51. Yahoo knowingly and intentionally developed persistent, unique identifiers to track Plaintiffs and Class Members across internet-connected services, despite knowing these types of identifiers were at odds with users' expectation of privacy.

52. Yahoo knew that its identifiers, especially Yahoo ConnectID, circumvented existing privacy protections (like the deprecation of third-party cookies) because it developed this identifier specifically as an alternative to such privacy-preserving mechanisms.

53. Yahoo offered and provided ConnectID to websites, mobile applications, advertisers, data brokers, and other internet-connected services so that Yahoo would have a unique way of tracking Plaintiffs and Class Members across devices and platforms.

54. Yahoo knowingly and intentionally used its identifiers, and data associated with it, to profile online users and facilitate targeted advertisements for profit.

## JURISDICTION AND VENUE

55. Jurisdiction is proper under 28 U.S.C § 1332(d) because: (1) the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, (2) there are more than 100 putative members of the Class, and (3) a significant portion of Class Members are citizens of a state different from Yahoo.

56. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy in this case exceeds $75,000 and this action is

[1] Upon information and belief, Yahoo ConnectID is a service provided by Yahoo Ad Tech LLC. However, Yahoo Inc. is the entity that stores, uses, and compiles user profiles tied to ConnectID and owns and controls Yahoo's lucrative advertising business.

between citizens of different states. Plaintiffs are residents of Vermont and California whereas Defendants are Delaware entities with their principal places of business in New York.

57. This Court has personal jurisdiction over Yahoo because Yahoo's principal place of business is in New York.

58. Venue is proper under 28 U.S.C. §1391(b), (c), and (d) because Yahoo is headquartered in this District and subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### I. BACKGROUND OF USER TRACKING

59. Over a decade ago, Apple announced it would no longer allow app developers to intercept "UDIDs" which are unique identifiers. These persistent identifiers were deprecated because they are seen as privacy intrusive—they cannot be reset and were used to facilitate targeted advertising.

60. This trend continued. Starting in 2020, Apple and Google announced the phasing out of advertising identifiers (IDFA and ADID) and third-party cookies in favor of more privacy-preserving mechanisms.

61. The loss of some of the most common unique identifiers raised serious concerns within the multi-billion-dollar digital advertising industry. Digital advertisers relied on these identifiers and cookies to uniquely identify individuals who use their products and services—and other entities' products and services—to serve targeted advertisements to individuals, based on profiles of information reflecting web and app activities indexed to unique identifiers present in third-party cookies.

62. For instance, a mobile app developer would use identifiers like the IDFA and ADID created by iOS and Android phones to track user activity across their mobile application,

understand what actions users took and their preferences, interests, and other information. The company would then send that information to an advertising company, such as Google, to serve targeted advertisements to that customer using this unique identifier.

63. Proposed replacements for these unique identifiers and third-party cookies were not nearly as effective. For instance, some companies sought to track user "sessions" (i.e., one interaction with the webpage until the user closes out) in lieu of other unique identifiers. However, this alternative was not nearly as powerful as directly tracking an individual at the user or device level.

## II. YAHOO'S UNIQUE AND PERSISTENT CONNECTID

64. Yahoo's Identity Graph is a solution that ties together all known identifiers for a consumer, including their IP addresses and unique device identifier.

65. To prepare for the eventual deprecation of third-party cookies and limit on device identifiers, Yahoo created the Yahoo ConnectID. Yahoo advertises its new, persistent identifier as "future-proofed" specifically because it is a work-around to cookie blocking and deprecation of device identifiers.

66. Yahoo created Yahoo ConnectID in December 2020.

67. Every individual who uses a Yahoo owned property (e.g., Yahoo Mail, Yahoo Sports, TechCrunch, AOL, Engadget, etc.) is assigned a ConnectID by Yahoo. This identifier is tied directly to users' email addresses (a form of PII) and allows them to be consistently tracked across the internet. These Yahoo ConnectIDs serve as the anchor for the identity-based profiles Yahoo maintains on individual consumers.

68. Notably, Yahoo users aren't the only individuals who have a ConnectID. Yahoo also assigns a ConnectID to ***non-Yahoo users***. When Plaintiffs and Class Members visit a website or

internet-connected service that enables ConnectID (regardless of whether they are a Yahoo user), Yahoo intercepts their email addresses, which is typically hashed using SHA-256. Yahoo then processes and analyzes whether the user has an existing ConnectID using this hash value by checking its extensive database and, if not, creates a new one. The ConnectID, therefore, permits consistent user-level tracking across the internet based on directly identifiable email addresses.

69. ConnectIDs are ***not*** a form of anonymized data. This data remains identifiable because it is tied to actual PII. Thus, while ConnectID does not itself contain the users' actual email address or phone number, it serves as the functional equivalent of those values based on its direct mapping to them.

70. Yahoo's use of hashing in this process does not protect users' emails addresses or render the data anonymous. Indeed, this methodology has been ***repeatedly criticized***, including by the Federal Trade Commission ("FTC"). The FTC has confirmed that "hashing" email addresses that always return the same identifying number (like here) is both an "old" and "flawed" methodology because the hashes are not "anonymous" and "can still be used to identify users, and their misuse can lead to harm." It cautions: "[c]ompanies should not act or claim as if hashing personal information renders it anonymized."

71. Here, based on how ConnectID is configured, every time a user enters the same email address on a website or platform, the same hash value and thus ConnectID is used—exactly what the FTC cautions against.

72. Especially problematic, ConnectID is a ***stronger*** identifier than those that previously existed. For instance, first-party cookies are typically limited in that they only track a user on one specific website. ConnectID goes ***further*** by tracking users across ***all*** websites and apps using this identifier, as well as other means. Similarly, if a user cleared their browsing history,

cookies, and other identifiers, this would reset most traditional cookies. ConnectID, however, bypasses this functionality as it would simply reassign the same ConnectID whenever the user logged-in again. This makes it possible to create highly profitable identity profiles, by aggregating data across all apps and websites a person uses, at the expense of the individual's right to privacy.

73. ConnectID is also linked to the "puid" cookie, a first-party cookie that acts as a domain-specific user identifier stored in local and/or cookie storage on the user's device. Yahoo also uses the value "tbla_id" which is a cookie used whenever a user has logged into Yahoo recently, which is also used to bolster Yahoo's ConnectID-based identity profiles. These are just two other examples of identifiers that Yahoo also relies on to consistently profile and identify otherwise anonymous individuals on the internet.

74. Yahoo's ConnectID has become "one of the world's most popular cookieless identifiers" and is implemented "across nearly 50,000 publisher domains[.]" It is used across websites, apps, and even connected TVs. For instance, Paramount, Tubi, and NBCUniversal all have partnerships to use Yahoo ConnectID, as well as its Next-Gen Solutions (discussed further below).

75. Yahoo's Connect ID can also be used in connection with other third-party data platforms—like Live Ramp, Epsilon, Adobe, Acxiom—meaning these other third parties are also tracking users via ConnectID and can sync them with their own identifiers. ConnectID has been used to successfully identify over 300 million unique, logged-in users.

## III. HOW CONNECTID IS INTEGRATED ON WEB PROPERTIES

76. Yahoo makes its ConnectID available across the ad tech industry, including to website and app developers, publishers, and advertisers. Each client must first register with Yahoo before they can access Yahoo's ConnectID product.

77. Yahoo publicly describes five methods to integrate its Connect ID: (1) Prebid method; (2) JavaScript method; (3) server-to-server method; (4) Google Secure Signals; (5) LiveRamp ATS; and (6) Amazon CxM. Yahoo created and controls each of these integration methods and provides explicit instructions to its clients to enable Yahoo's software on their web properties.

78. Alarmingly, Yahoo openly tells publishers that they need not concern themselves with obtaining user consent because it already provides "multiple mechanisms" for users to manage their privacy choices. This is misleading at best. Yahoo's Privacy Policy makes no mention of sharing directly identifiable email addresses and, in fact, represents that email addresses will not be shared. Plaintiffs and Class Members had no way of knowing they were being uniquely identified and tracked across the internet through their email addresses.

**A. The Prebid Method**

79. The Prebid method—controlled and operated by Yahoo—is designed for publishers. Publishers register with Yahoo and configure the ConnectID module within their existing Prebid.js implementation.

80. This module enables Yahoo to associate users with a Yahoo ConnectID and pass that identity into the bidstream during RTB, thus facilitating cross-site targeting even in environments where third-party cookies are unavailable.

81. Specifically, this framework is designed so that Yahoo can intercept SHA-256 hashed email address, which is used to generate a new Yahoo ConnectID or match to an existing one.

82. When an ad call is made to SSPs, including Yahoo's SSP, the Yahoo ConnectID is included in the OpenRTB request payload. This can be observed in network traffic, where the

ConnectID is listed under the "user.ext.eids" array with "source": "yahoo.com". As described in Section IV, the OpenRTB request payload reveals additional information about the user beyond their identity.

**B. The JavaScript Method**

83. The JavaScript method—also owned and controlled by Yahoo—is just a more direct integration, as it is incorporated in the source code level of developers' or advertisers' websites. Entities again must register with Yahoo, but instead of enabling ConnectID through the Prebid.js implementation, they use node package manager ("npm") to install the module in the terminal and embed the JavaScript code provided by Yahoo directly into their source code.

84. Once enabled on the web property, Yahoo intercepts SHA-256 hashed or "raw email" addresses. Yahoo then processes this information and assigns or returns the ConnectID, which is typically stored in the user's local storage, and returns it back to the entity.

**C. The Server-to-Server Method**

85. The server-to-server method works similarly to the Prebid and JavaScript methods but uses tokens and initially transmits this data between two back-end servers, hence the name.

86. First, the entity obtains OAuth credentials directly through Yahoo to authenticate API requests. Once the credentials are set up, the entity generates a JSON Web Token (JWT), which is submitted to a Yahoo endpoint to obtain an "access token" from Yahoo so the entity can send future API requests.

87. Next, through Yahoo's integration, Yahoo intercepts through an API call the SHA-256 hashed email address, as well as other parameters, such as a client_id. Yahoo then assigns or identifies the ConnectID, which it returns to the entity.

**D. The Google Signals Method**

88. Entities with a Google Ad Manager account can integrate Yahoo's ConnectID through the Secure Signals feature. This involves signing into their account, navigating to Inventory > Secure Signals**,** enabling Yahoo ConnectID by toggling its status, selecting a method for deploying the signal collection script (either Google auto-deployment or the Prebid UserID module), and saving the settings.

89. Once configured, the ConnectID script is up and ready to go. The script generates first-party cookies when users interact with the entity's website—including "yahooid"—which contains SHA-256 hashed email addresses. The ConnectID script reads the value and uses it to generate, or identify an existing, ConnectID.

**E. The Amazon CxM Method**

90. Like the Google Signals Method, entities can "seamless[ly]" and with "little effort" incorporate ConnectID simply by changing settings in the entity's Amazon Publishers Service.

91. Once configured, the ConnectID script is up and ready to go. The script generates first-party cookies when users interact with the entity's website—including "yahooid"—which contains SHA-256 hashed email addresses. The ConnectID script reads the value and uses it to generate, or identify an existing, ConnectID.

**F. The LiveRamp ATS Method**

92. Similarly, enabling ConnectID through LiveRamp requires "minimal effort" but "unlock[s]" and allows entities to "better monetize their supply" through "additional demand in Yahoo DSP for the cookieless world.

93. Yahoo offers to assist customers in enabling ConnectID with LiveRamp. When completed, LiveRamp—through its Authenticated Traffic Solution—picks up the ConnectID when

email addresses are intercepted on the entity's website. Thus, this is yet another way Yahoo tracks users through ConnectID when they visit a participating entity's website.

## IV. YAHOO USED CONNECTID AND USER PROFILES TO FUEL ITS BUSINESS

94. Yahoo created the ConnectID precisely because of its synergy with its existing analytics, advertising, and AI products, all of which are designed for the purpose of generating revenue through targeted advertising. Through each of these products, Yahoo benefits directly from ConnectID and its Identity Graph, and therefore from users' PII (i.e., email addresses), as well as their other private online activity. These products are described below.

95. **Yahoo Dot Tag and Pixel API.** Yahoo's Dot Tag and Yahoo's Pixel API are mechanisms created by Yahoo and embedded on webpages to intercept users' activity on the webpage. This includes interactions like page views, clicks, form submissions, conversions, and other activity tracked through what are known as "events." These mechanisms also intercept persistent identifiers, such as cookies and device identifiers. The information intercepted is used to provide robust user identification and develop user profiles, described further below, all of which can be associated with a user's ConnectID.

96. **Yahoo Analytics.** Similar to Yahoo Dot Tag and Yahoo's Pixel API, Yahoo Analytics is used to intercept and track users' activities across the web. The information intercepted includes identifying information, such as cookies, device identifiers, and IP addresses, as well as full-string URLs reflecting users' private online activities, such as their searches and the pages they view across the internet. Advertisers and developers can associate this information with Yahoo's user profiles and thus the user's ConnectID.

97. **Yahoo's User Profiles.** Yahoo's ConnectID is not just an identifier product. Rather, through ConnectID, Yahoo creates a profile of each logged-in user who accessed its own

properties, including Yahoo Mail, Yahoo Sports, Yahoo Connected TV, TechCrunch, AOL, Engadget, etc. Yahoo logs every signal about the user, including for example, their searches, purchases, and location information. Yahoo collects all of this engagement data as a first-party, synthesizes the data, and compiles it into a "comprehensive and deep" profile for each user. Yahoo, therefore, is able to maintain a "user match pool" that "preserves the identity and preferences" of its users across all the properties it owns or operates. So far, Yahoo is maintaining user profiles for at least 300 million logged-in users.

98. Further, Yahoo is constantly "enrich[ing]" the ConnectID user profiles by joining its first-party data with data from other sources. Yahoo accomplishes this through its "Interoperability Program" which is Yahoo's effort to match ConnectID with different identifiers created by other parties. For example, when an ad publisher implements ConnectID and passes user data to Yahoo along with other different identifiers, Yahoo would match ConnectID with these identifiers and then use the data to supplement the user profile linked to the user's ConnectID. Yahoo applies the same process to advertisers as well. According to Yahoo, it is able to match its ConnectID with identifiers from "all leading CDP and DMP providers," including but not limited to those from "Acxiom, Adstra, Equifax IXI, Experian, Neustar, TransUnion, Throtle and Epsilon." If a client uses an identifier that does not match with ConnectID within Yahoo's existing Interoperability Program, Yahoo then works with the client to "bring those [identifiers] in," "translate those into ConnectID," and "activate through the entire [Yahoo] stack." Still, Yahoo does not stop there—it also allows its clients to provide PII such as phone number or physical address to match directly with ConnectID. Because the ConnectID user profiles ingest data from all of these sources along with various other identifiers, they have "resolution to an individual" rather than just to email accounts.

99. **Yahoo's Supply-Side Platform.** Previously, Yahoo participated in RTB as a supply-side platform (SSP), which is how publishers sell their ad inventory. Yahoo as an SSP—and its SSP partners—recognize and use ConnectID, which they transmit with bid requests received by DSPs. SSP's that recognize ConnectID include Pubmatic, Magnite, and InMobi Advertising.

100. **Yahoo's Demand-Side Platform.** Also, as a part of RTB, Yahoo acts as a demand-side platform (DSP). As a DSP, Yahoo allows advertisers to bid on and purchase ad space. Publishers and SSPs often include ConnectID in the bid request (described above), as well as other identifiers like cookies. Yahoo uses ConnectID to link the ad target (i.e., who will see the ad) to an existing user profile in Yahoo's systems, enabling its advertising customers to target users at an individualized level. Thus, ConnectID directly contributes to how successful Yahoo's DSP customers are in serving targeted ads, which results in profits to Yahoo.

101. **Creating Audiences.** Yahoo's customers can leverage ConnectID in conjunction with Yahoo's suite of advertising products to maximize their ad spend and ability to target individuals at the user-level. Yahoo boasts that these customers have access to over 4 trillion data points and 450+ "accurate audience segments." Customers can use these existing audiences, create custom audiences, or predictive audiences (powered by machine learning, described below)—all linked to ConnectID—to target individuals across Yahoo's ecosystem, including in RTB. Customers can also share their own first-party data to "seamlessly match" it with ConnectID to further target these individuals.

102. **Machine Learning & AI.** Yahoo uses its ConnectID and Identity Graph—comprised of millions of "known users"—to train AI and machine learning algorithms that profile and target unknown individuals, a product Yahoo refers to as "Next-Gen." As the ConnectID seeks

to identify logged-in users of Yahoo and its partners' properties, the Next-Gen solution seeks to identify those who did not log in while accessing these properties by inferring the identity and preferences of the individual from existing data through machine learning algorithms. For example, when an unidentified user engages in activity, such as browsing for Chicago Bulls merchandise, Yahoo's Next-Gen models compare this behavior against the patterns of known users to infer traits like interests, demographics, or purchasing intent. In effect, Yahoo leverages its vast surveillance dataset to make behavioral predictions about individuals even when it lacks direct identifying information about them. Yahoo's Chief Revenue Officer, Elizabeth Herbst-Brady, refers to this as a solution for "advertisers and publishers" to be "successful" when confronting "non-addressable inventory" (i.e., users for whom there is no ConnectID). As Yahoo's own Vice President on Ads Data acknowledges, Yahoo relies on the ConnectID user profile data as training data to constantly finetune its Next-Gen models.

**REAL-WORLD EXAMPLES**

103. Plaintiffs Baker, Davis, Hunting, and Corvi, like other Class Members, frequently visit websites, including CBS Sports. When a user visits CBS Sports (at the following domain: https://www.cbssports.com/), users are not prompted to agree to cookies or other forms of online tracking.

104. As soon as a user visits this website, Yahoo begins tracking the user. This can be observed through network traffic, which shows Yahoo immediately intercepts data to its own domain "ups.analytics.yahoo.com." Yahoo collects an "A3" cookie as well as the "IDSYNC" cookie. The A3 cookie is a unique identifier used by Yahoo for advertising and personalization. The "IDSYNC" cookie allows Yahoo and other similar data brokers to share (i.e., "sync") their unique identifiers, including ConnectID, with one another so both companies can successfully

identify and target the user. Yahoo also collects the user's IP address. On the CBS Sports website, it is clear that Yahoo is syncing identifiers with, at least, Rubicon—a known SSP. Yahoo continues to do this as CBS Sports users continue to navigate to other web pages on the website. Upon information and belief, Yahoo uses this information to sync CBS Sports users with their ConnectID.

105. CBS Sports is also an ad publisher and therefore relies on SSPs to sell ad space—most notably, the company GumGum. When users, including Plaintiffs Baker, Davis, Hunting, and Corvi, log into CBS Sports, their identifiers—such as Yahoo's ConnectID—are transmitted to GumGum during RTB. This can be observed in the payloads sent from CBS Sports to GumGum. GumGum then shares this information with DSPs, like Yahoo, which use it to bid on available ad inventory. Because Yahoo maintains user profiles tied to ConnectID, this enables it to serve targeted advertisements based on users' identities and behaviors. Thus, Yahoo has additional insight about the user, unlike competing DSPs.

106. Walmart's website (available at: https://www.walmart.com/) and HealthLine's website (available at: https://www.healthline.com/), both of which Plaintiff Baker used, also rely on Yahoo Analytics. Yahoo again intercepts data to its domain "sp.analytics.yahoo.com", including the A3 cookie and IDSYNC cookie, both of which are used for identification purposes. Yahoo also collects the user's IP address. On Walmart specifically, Yahoo continues to intercept and track user's interactions, including full-string URLs reflecting their searches and pages they view. Upon information and belief, Yahoo uses this information to sync Walmart and HealthLine users with their ConnectIDs.

107. US Magazine's website (available at: https://www.usmagazine.com/), which Plaintiff Hunting also used, also relies on Yahoo Analytics. Yahoo again intercepts data to its

domain "ups.analytics.yahoo.com", including the A3 cookie and IDSYNC cookie, both of which are used for identification purposes, as well as the user's IP address. Upon information and belief, Yahoo uses this information to sync US Magazine users with their ConnectIDs.

108. Realtor.com's website (available at: https://www.realtor.com/), which Plaintiffs Davis and Hackett also used, also relies on Yahoo Analytics. Yahoo again intercepts data to its domain "pr-bh.ybp.yahoo.com", including the A3 cookie, which is used for identification purposes, and the user's IP address. On the Realtor.com website, it is clear that Yahoo is syncing identifiers with, at least, Rubicon. Upon information and belief, Yahoo uses this information to sync Realtor.com users with their ConnectIDs.

109. FanDuel's website (available at: https://www.fanduel.com/), which Plaintiffs Baker and Lowery used, also relies on Yahoo Analytics. Yahoo intercepts data to its domain "sp.analytics.yahoo.com", including the A3 cookie and IDSYNC cookie, both of which are used for identification purposes, and the user's IP address. Upon information and belief, Yahoo uses this information to sync FanDuel users with their ConnectIDs.

110. These are not isolated instances. Testing of 10,000 popular web properties revealed Yahoo's tracking technology is on roughly one in every twenty websites, underscoring the scale of Yahoo's covert surveillance.

111. The scope of this tracking spans nearly every sector of daily life: travel (e.g., marriott.com), health (e.g., webmd.com, drugs.com, verywellhealth.com, medscape.com, everydayhealth.com, health.com, healthgrades.com), hospitals (e.g., stjude.org), weight-loss and prescription websites (e.g., weightwatchers.com), genetic testing (e.g., ancestry.com), retail and shopping (e.g., rakuten.com, nordstromrack.com), financial services (e.g., americanexpress.com, schwab.com, vanguard.com, experian.com), insurance providers (e.g., statefarm.com), and many

more.

112. Taken together, Yahoo gains an insider's view into nearly every aspect of Plaintiffs' and Class Members' private lives—something Yahoo never should have had access to. That Yahoo compiles this information into detailed, identifiable profiles and sells access to them for profit only compounds the privacy-invasive nature of its conduct.

## PLAINTIFFS AND CLASS MEMBERS HAVE A REASONABLE EXPECTATION OF PRIVACY

113. Internet users do not expect to be tracked across every single one of their internet-connected devices, including their web browser, apps, TVs, and more.

114. Indeed, the advent of privacy-preserving mechanisms like Apple's "Do Not Track" feature, which can prevent companies from collecting IDFA/ADID from individuals who opt-out, and similar features described above, has confirmed this expectation.

115. One study by Flurry Analytics (ironically) in 2021 shows that 88% of iOS users worldwide have availed themselves of this feature, indicating an intent to prevent apps from tracking them on their mobile devices.

116. Users do not know—and did not expect—that Yahoo would circumvent these protections by creating a new identifier that is even better than IDFA/ADID at tracking them across services.

117. Yahoo itself does not provide any information in its Privacy Policy for Plaintiffs and Class Members to understand which websites or online services use ConnectID, such that they have no way of uncovering which services do or do not contain Yahoo's tracking technology.

118. Plaintiffs and Class Members reasonably expected that their online activity would not be tracked by an unknown company, let alone that it would be used to target them across online services for profit.

**YAHOO'S CONDUCT VIOLATES ESTABLISHED DATA PRIVACY REGIMES**

119. The GDPR and CCPA both mirror Fair Information Practice Principles (FIPPs). Two of the core tenets of FIPPs are (1) clear user consent; and (2) data minimization.

120. Yahoo does neither of these things. Despite creating a cross-device persistent user identifier, Yahoo makes zero effort to ensure Plaintiffs and Class Members are even aware of where this technology is used. This is clear from its own Privacy Policy, which makes no attempt to identify the entities using its services or disclose that Yahoo creates ConnectIDs based off of users' email addresses. This is directly at odds with Yahoo's representation that its ConnectID and advertising solutions are "[p]rivacy first" and respect "[c]onsumer choice."

121. Separately, the creation of an ever-present persistent identifier is inconsistent with the principle of data minimization, which requires that data should be stored and used only for the period of time in which that data is necessary. Indeed, the fact that device and user-specific identifiers are persistent (and not deleted) is exactly why even device identifiers like IDFA are being phased out by companies like Apple to preserve users' privacy. Yahoo's creation of ConnectID—a permanent and consistent identifier—is a regression from today's privacy norms.

**THE DATA YAHOO INTERCEPTS OBJECTIVELY HAS VALUE**

122. In 2023, online advertising was estimated to be a $200 billion industry. The more information advertisers know about consumers, including how to reach them directly, the more revenue they can generate.

123. That is why unique identifiers and other PII, like email addresses, are extremely valuable. Indeed, several data brokers sell access to email addresses—including hashed email addresses—for a price.

124. For instance, datarade.ai currently advertises a Datasys dataset of 10 million hashed

emails (using common techniques, including SHA) for $5,000 a month. Another dataset, offered by the company Irys, is specifically advertised as "identity data" containing device IDs, hashed emails, IP address, country code, and timestamps. A similar dataset, offered by Stirista, likewise contains hashed email addresses and IP addresses, among other PII, and retails for $9,500 a month or $114,000 a year.

125. The data here is *especially* valuable in light of the other private data Yahoo also intercepts, including users' searches and queries through their browsing activity, that it incorporates into its user profiles. Companies regularly trade in this type of data, with some companies, like Google and Reklaim, paying consumers to access this data directly.

126. Yahoo itself recognizes the value of this data, given that its entire business model is contingent on its monetization. For example, this data is fundamental to training and improving Yahoo's models and algorithms that power its identity and advertising offerings, including its Next-Gen identity solutions which serve as the non-deterministic part of its identity offerings, as well as its Next-Gen audiences which rely on ConnectID data to infer audience characteristics for advertising purposes. It is also essential to power Yahoo's role in the RTB process, both as a (now-defunct SSP) and DSP. Yahoo profits from all of these services, all of which are directly tied to Yahoo's ConnectID and user profiles.

127. The value of this data to Yahoo—and its clients—is significant. At least one report shows that ad publishers with access to Yahoo's ConnectID see 40% more ad revenue per impression than those without it. They also win 34.3% more bids in the RTB process. Similarly, Yahoo's Next-Gen solutions—powered by machine learning admittedly trained on ConnectID user profiles—provide a 76% increase in ad revenue per impression and 37.5% higher win rate. Yahoo itself boasts that as a DSP it wins "nearly 90%" of head-to-head competitive tests against its

competitors.

128. This translates directly into more profits for Yahoo. Yahoo's continuous monetization of data it should have never had is unjust and unlawful.

## YAHOO CAUSES ADDITIONAL HARM

129. In addition to the privacy intrusions described above, and the objective value of the data Yahoo intercepts, Yahoo's Connect ID and associated tracking technology have a measurable impact on Plaintiffs' and Class members' devices and computing power.

130. Several studies show that tracking technology—like Yahoo's here—takes up additional bandwidth, CPU time, data usage, and power consumption.

131. For instance, the entity Brave estimates that, on average, these types of technologies take up an additional 899 KB per webpage in bandwidth.

132. Similar research suggests that serving ads—which Yahoo provides as a (former SSP) and DSP using ConnectID—takes up approximately 35%-52% of bandwidth, with others placing that figure as high as 79%.

133. It also causes slower load times. For instance, one study estimates that this type of ad-tech takes approximately 15% of the CPU workload. The same issue persists with mobile apps, with serving ad-based content using up 23% of the app's total energy.

134. Another study reports that websites with tracking technology incorporated in the background of webpages—like Yahoo's—take *nearly twice* as long to load than if such tracking technology was not present on the website. Tracking technologies like Yahoo also result in an additional 15% of power consumption for loading websites, according to a study.

135. Other studies show that when these types of tracking technologies—particularly requests to tracking domains like Yahoo's—are disabled, consumers can see a 44% reduction in

page load time (e.g., faster loading speeds) and a 39% reduction in device data usage.

136. Thus, if not for Yahoo's secretly embedded technology, Plaintiffs and Class Members would see bandwidth, CPU, data usage, and power consumption savings. This is particularly important, as device batteries have only a finite number of charges before they need to be replaced, and most data plans have bandwidth caps after which users will be charged or experience slower load times.

137. Similarly, Yahoo's use of identifiers—including its Connect ID—directly occupy space on Plaintiffs' and Class Members' local storage. Yahoo did not have permission to take up *any* storage on Plaintiffs' or consumers' browsers. This is yet another, separate harm caused as a result of Yahoo's conduct.

**YAHOO DID NOT HAVE CONSENT**

138. Neither Yahoo nor non-Yahoo users would have any reason to suspect that Yahoo's ConnectID is a persistent, email-based identifier that Yahoo was using to track, profile, and target them across the internet. Nor would they have any reason to suspect that Yahoo was intercepting and consolidating other identifying information, like their IP addresses and unique device identifiers, or their private searches, queries, and other online activity, into the same identifiable user profiles.

139. Non-Yahoo users, in particular, would have no reason to ever visit any of Yahoo's purported privacy disclosures. But Yahoo users *also* would not be able to discern from these policies the type of wide-spread tracking Yahoo engages on non-Yahoo web properties.

140. For instance, Yahoo's privacy policies[2] state they apply to Yahoo's "Services" which are defined as "*Yahoo* brands, websites, apps, advertising services, products, services or

[2] *See* ECF No. 42-9.

technologies." No further clarification of any of these terms are provided. Consumers would, rightfully, expect that these "Services" mean those occurring on Yahoo's own properties, not thousands of websites that are in no way associated with Yahoo.

141. Indeed, nowhere in these terms does Yahoo ever describe any specific non-Yahoo properties or services that could possibly be encompassed by its ongoing data collection and profiling efforts. Its brief references to unknown "third-party services" and unidentified "partners" who it *may* sometimes "*obtain* information from" says nothing about Yahoo's *direct interception* of private data from consumers themselves from non-Yahoo properties. Nor does it mention Yahoo's profiling efforts, where it consolidates all this information.

142. Yahoo's other generic claims in its privacy policy are equally insufficient to establish consent. For instance, its boilerplate statement that it uses undefined "collection technologies" it "offer[s] to partners" to "understand [Yahoo users'] activity" would not provide a reasonable user with notice that Yahoo is personally profiling them across the internet based on personally identifiable data or that these profiles contain—in essence—all their email addresses, device identifiers, IP addresses, and private searches and queries. No reasonable Yahoo user would know what these "collection technologies" even are (or how to identify them given their inconspicuous nature) or what Yahoo means by "partners" (let alone that its actually thousands of non-Yahoo websites).

143. None of the other purported standalone policies Yahoo maintains can cure this deficiency as none of them disclose ConnectID or when or how Yahoo is obtaining individuals' information, or which information is collected in which contexts sufficient to obtain consent for

that conduct.[3]

144. Each of these documents confirms the same thing. Yahoo has gone out of its way to make it nearly impossible for consumers, whether Yahoo or non-Yahoo users, to ever understand or uncover its lucrative profiling practice, including where Yahoo is spying on them or how to avoid it.

## TOLLING & CONCEALMENT

145. The earliest Plaintiffs and Class Members could have discovered Yahoo's conduct was shortly before the filing of this Complaint. Plaintiffs became aware of Yahoo's conduct through communications with counsel that are protected from disclosure.

146. Plaintiffs and Class Members, despite their due diligence, could not have discovered Yahoo's conduct by virtue of how its technology works and its lack of disclosures.

147. Yahoo's interception of unique identifiers, including ConnectID, other personal data, and identifiers, happens inconspicuously in the background. This process is undetectable to an ordinary person, highly technical, and prevented Plaintiffs and any Class Member from uncovering it.

148. Yahoo had exclusive knowledge that ConnectID, its other identifiers, and its tracking technology were tracking Plaintiffs and Class Members across the internet alongside their private communications on third-party apps, websites, and other services. Similarly, Yahoo had exclusive knowledge that it was using this information to propagate one of the largest targeted advertising systems.

149. Yahoo's fraudulent conduct prevented Plaintiffs and Class Members from

[3] Yahoo previously submitted multiple documents that it claims created consent to ConnectID. *See* ECF No. 42-9; ECF No. 42-10; ECF No. 42-11; ECF No. 42-12.

discovering its conduct. Yahoo maintained a privacy policy that lacked adequate disclosures for Plaintiffs and Class Members to uncover that Yahoo even intercepted, had, or used their data. Yahoo publicly held out its identifiers and technology as privacy-preserving mechanisms, even though they were not.

150. Yahoo was under a duty to disclose the nature and significance of its data interception and use practices—especially in light of its public statements—but did not do so. Yahoo is therefore, estopped from relying on any statute of limitations by virtue of the discovery rule and doctrine of fraudulent concealment.

## CLASS ACTION ALLEGATIONS

151. Plaintiffs bring this action under Fed. R. Civ. P. 23 individually and on behalf of the following Classes and Subclasses:

> **Identifier Class:** All natural persons in the United States for whom Yahoo intercepted or assigned a ConnectID or other identifier.
>
> **California Identifier Subclass:** All residents of California for whom Yahoo intercepted or assigned a ConnectID or other identifier.
>
> **New York Identifier Subclass**: All residents of New York for whom Yahoo intercepted or assigned a ConnectID or other identifier.
>
> **Communications Class:** All natural persons in the United States who had their communications with third parties intercepted or used by Yahoo without their consent.
>
> **California Communications Subclass:** All residents of California who had their communications with third parties intercepted or used by Yahoo without their consent.
>
> **New York Communications Subclass:** All residents of New York who had their communications with third parties intercepted or used by Yahoo without their consent.

152. The Classes exclude: (1) any judge presiding over this action or their immediate families; (2) Yahoo, its subsidiaries, affiliates, parents, successors, predecessors, and any other

entity in which Yahoo has a controlling interest; (3) Yahoo's current and former employees, officers, and directors; and (4) Plaintiffs' and Yahoo's counsel.

153. ***Numerosity.*** While the precise size of the Classes is currently unknown to Plaintiffs, each of the Classes consists of well over a million individuals and members of each of the Classes can be identified through Yahoo's records.

154. ***Predominant Common Questions.*** The Classes' claims present several common questions of law and fact that predominant over questions (if any) that affect individual class members. This includes:

a. Whether Yahoo violated Plaintiffs' and the Classes' privacy rights;

b. Whether Yahoo engaged in unfair and deceptive conduct;

c. Whether Yahoo's acts and practices violate Section 1 of the California Constitution;

d. Whether Yahoo's acts and practices violate Cal. Penal Code § 631;

e. Whether Yahoo's acts and practices violate Cal. Penal Code § 632;

f. Whether Yahoo's acts and practices violate Cal Penal Code §§ 638.50 and 638.51;

g. Whether Yahoo's acts and practices violate Cal. Penal Code § 502;

h. Whether Yahoo's acts and practices violate New York General Business Law § 349;

i. Whether Plaintiffs and Class Members are entitled to damages and/or equitable relief, including injunctive relief, restitution, and disgorgement; and

j. Whether Yahoo was unjustly enriched.

155. ***Typicality.*** Plaintiffs' claims are typical of all Class Members because they arise from the same conduct and are based on the same legal theories.

156. ***Adequate Representation.*** Plaintiffs will (and have) fairly and adequately represented the Classes and protected the interest of all Class Members. Plaintiffs have retained competent counsel with significant experience in class action and data privacy litigation. Plaintiffs

and counsel have no interest that conflicts with the interests of the Classes and are not subject to any unique defenses. Plaintiffs and their counsel will vigorously prosecute this action to advance the interest of the Classes and have the resources necessary to do so.

157. ***Substantial Benefits.*** A class action is superior to all other possible methods to fairly and efficiently adjudicate this case and controversy, and joinder of all Class Members is impracticable. Proceeding as a class case has significant advantages to individual litigation, including: (1) comprehensive oversight by a single court, which avoids inconsistent outcomes; and (2) saving time and expense by litigating the same claims arising from the same conduct all in one action.

158. Plaintiffs reserve all rights to revise or modify the class allegations based on facts and legal developments following additional investigation or discovery.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violation of New York General Business Law § 349 ("GBL § 349")**
**On Behalf of the Plaintiffs and Classes**

159. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

160. Yahoo is considered a "business" under GBL § 349.

161. Yahoo's business acts and practices are unfair and deceptive under GBL § 349. New York has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data.

162. Yahoo violated GBL § 349 by, among other things, (1) surreptitiously intercepting Plaintiffs' and Class Members' email addresses, identifiers, and IP addresses through its tracking technology; (2) creating a persistent identifier (i.e., Yahoo ConnectID) to track Plaintiffs and Class

Members consistently across thousands of websites; (3) using its tracking technology to secretly monitor and intercept Plaintiffs' and Class Members' private searches, queries, and other private activity on non-Yahoo web properties; (4) creating unique user profiles for Plaintiffs and Class Members based on this wrongfully obtained private data; and (5) using and monetizing these user profiles to fuel its advertising business, including using these profiles to train its machine learning model and serve advertisements as a DSP on behalf of its clients.

163. Plaintiffs and Class Members did not consent to any of this conduct. At no time did Yahoo inform Plaintiffs or Class Members that it was secretly using their PII to track their activities and communications on other websites to create user profiles used for its advertising business.

164. Yahoo's business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm of Yahoo's secret collection and use of their PII for advertising purposes is significant, and there is no corresponding benefit resulting from such conduct. Finally, because Plaintiffs and Class Members were completely unaware of Yahoo's conduct, they could not possibly have avoided the harm.

165. By collecting and using Plaintiffs' and Class Members' PII, intercepting their private data, including searches and queries, and profiling users for its own financial gain, Yahoo has caused harm to Plaintiffs and Class Members by violating their privacy interests. Plaintiffs and Class Members seek all available damages under applicable state consumer protection laws, including statutory damages under GBL § 349.

## SECOND CAUSE OF ACTION
**Violation of Common Law Invasion of Privacy (Intrusion Upon Seclusion)**
**On Behalf of the California Plaintiffs and Subclasses**

166. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with

the same force and effect as if fully restated herein.

167. Intrusion upon seclusion requires pleading: (1) that the defendant intruded on a place, conversation, or matter in which plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

168. Yahoo's collection, interception, and use of Plaintiffs' and Class Members' personally identifiable information constitutes an intentional intrusion. As does its use of this information to create "Identity Graphs," which are keyed off these identifiers to track and profile Plaintiffs and Class Members based on their online activity.

169. Yahoo's interception and use of Plaintiffs' and Class Members' private online communications, associated with their assigned ConnectID and other identifying information, is likewise an intentional intrusion upon Plaintiffs' and Class Members' solitude.

170. Plaintiffs and Class Members reasonably expected their unique identifiers and other personal data, alongside their online activities, would not be intercepted or used by an unknown third party. The types of identifying information Yahoo stored in "Identity Graphs" are particularly private because they are often directly identifiable, permanent identifiers (e.g., IP address, phone number, email address). Plaintiffs and Class Members reasonably expected this information would remain private and confidential and would not be intercepted or used by third parties without their consent.

171. This expectation is particularly heightened given that there were no disclosures of Yahoo's involvement in intercepting, processing, and using their unique identifiers and other personal data and online communications.

172. Plaintiffs and Class Members did not consent to, authorize, or understand Yahoo's interception or use of their private data.

173. Yahoo's conduct is highly offensive because it violates established social norms. Consumers do not expect to be surveilled when they use the internet, especially in light of state laws requiring companies to make adequate disclosures regarding their collection and use of data.

174. Yahoo's conduct is particularly offensive in light of its secretive nature. Plaintiffs and Class Members had no way of knowing Yahoo collected their unique identifiers and other personal data and other online communications, and Yahoo did so from thousands of websites, if not more.

175. Yahoo's conduct caused Plaintiffs and Class Members harm and injury, including a violation of their privacy interests.

176. Plaintiffs and Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Yahoo as a result of its intrusion upon seclusion.

177. Since Defendants' conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' or Class Members' rights, Plaintiffs and Class Members are entitled to punitive and exemplary damages.

178. Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

## THIRD CAUSE OF ACTION
**Violation of Article I, Section 1 of the California Constitution (Invasion of Privacy)**
**On Behalf of the California Plaintiffs and Subclasses**

179. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

180. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending

life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. Art. I, § 1.

181. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

182. The right to privacy in California's Constitution creates a right of action against private and government entities.

183. Plaintiffs and Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, pursuant to Article I, Section I of the California Constitution.

184. The identifiable and private information Yahoo intercepted, stored, and used without Plaintiffs' and Class Members' consent was used to track them consistently, and persistently, across internet-connected services and to serve targeted advertisements. The manner in which Yahoo intercepted this information and used it to develop unique user profiles for advertising, defeated established privacy mechanisms and social norms.

185. This conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that there is an entity intercepting and monitoring all of their online activities, using this information to develop comprehensive user profiles, or monetizing these profiles through targeted advertising.

186. Yahoo's conduct violated the privacy of hundreds of thousands (if not millions) of Class Members, including Plaintiffs. Yahoo did not have consent to intercept this information, let alone use it.

187. Plaintiffs and Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Yahoo as a result of its intrusion upon seclusion.

188. Defendants' conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' and Class Members' rights, Plaintiffs and Class Members are entitled to punitive and exemplary damages.

189. Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

**FOURTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 631**
**On Behalf of the California Plaintiffs and Subclasses**

190. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

191. CIPA § 631 prohibits any person who by means of any "machine, instrument, contrivance" or in "any other manner:" (1) intentionally taps or makes an unauthorized connection with "any telegraph or telephone wire, line, cable, or instrument;" (2) willfully and without consent of "all parties to the communication" or in "any unauthorized manner" reads or "attempts to read" or "learns the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within" California; (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way" information so obtained; or (4) from aiding, agreeing, employing, or conspiring with "any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

192. Yahoo is a person under CIPA § 631.

193. Yahoo intercepted Plaintiffs' and Class Members' unique identifiers and other personal data and private communications while "in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within[.]"

194. Yahoo's technology (e.g., the Yahoo ConnectID, Yahoo Dot Tag, Pixel API, etc.), and Plaintiffs' and Class Members' computers, mobile devices, and connected TVs, are a "machine, instrument, contrivance, or . . . other manner" under CIPA § 631.

195. At all relevant times, Yahoo used its technology to make unauthorized connections with the lines of communication and instruments used by Plaintiffs and Class Members to access online services without the consent of all parties to those communications.

196. Yahoo willfully, and without consent, read or attempted to read, or learn the contents and meaning of, Plaintiffs' and Class Members' communications with online services while those communications were in transit or passing over a wire, line, or cable, or were being sent or received within California through its tracking technology, as described herein. This interception happens prior to or at the same time they would be received by the intended recipient.

197. Yahoo used, and attempted to use, these identifiable, private communications for its own benefit, including targeted advertising as described herein.

198. Yahoo also aided, agreed with, employed, and conspired with website operators and advertising entities to intercept and use this data for profit.

199. The interception and use of Plaintiffs' and Class Members' communications was without authorization or consent from Plaintiffs and Class Members.

200. Plaintiffs and Class Members have been harmed as a result of Yahoo's conduct. Their private data has been intercepted, viewed, and used for targeted advertising and has not been destroyed. Plaintiffs and Class Members face an imminent threat of continued injury, as this data

continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

201. Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

**FIFTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 632**
**On Behalf of the California Plaintiffs and Subclasses**

202. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

203. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication[.]"

204. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

205. Plaintiffs' and Class Members' communications with online services are confidential communications for purposes of § 632 because Plaintiffs and Class Members had an objectively reasonable expectation of privacy in this data. These private communications revealed Plaintiffs' and Class Members' private searches and queries across thousands of websites, which they did not expect would be eavesdropped on or monitored by a third party interloper.

206. Plaintiffs and Class Members expected their communications would not be shared with Yahoo, as there were no disclosures that Yahoo would secretly eavesdrop upon or record their

information and communications.

207. Yahoo's tracking technology is an electronic amplifying or recording device for purposes of § 632.

208. By contemporaneously intercepting and recording Plaintiffs' and Class Members' confidential and identifiable communications to online services through this technology, Yahoo eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

209. At no time did Plaintiffs or Class Members consent to Yahoo's conduct, nor could they reasonably expect that their communications with online services would be overheard and recorded by Yahoo.

210. Yahoo utilizes these private communications for its own benefit, including to serve targeted advertisements and develop user profiles.

211. Plaintiffs and Class Members have been harmed as a result of Yahoo's conduct. Their private data has been intercepted, viewed, and used for targeted advertising and has not been destroyed. Plaintiffs and Class Members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

212. Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

* * *

**SIXTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code §§ 638.50 & 638.51**
**On Behalf of the California Plaintiffs and Subclasses**

213. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

214. CIPA § 638.50(b) defines a "pen register" as a "device or process" that "records or decodes dialing, routing, addressing, or signaling information" that is "transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

215. Separately, CIPA § 638.50(c) defines a "[t]rap and trace device" as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

216. CIPA § 638.51 prohibits a person from installing or using either a pen register or trap and trace device without a court order.

217. Yahoo is a person under CIPA § 638.51.

218. Yahoo developed, implemented, used, and installed the ConnectID framework, as well as Yahoo Dot Tag and Pixel API—which are pen registers and/or trap and trace devices—on Plaintiffs' and Class Members' devices and browsers.

219. These processes captured "routing, addressing, or signaling information" because they intercept: (1) unique user and device identifiers; and (2) the Yahoo Org ID (indicating the website to whom the user is communicating).

220. Yahoo was not authorized by any court order to use a pen register or trap and trace device to record or capture Plaintiffs' and Class Members' routing, addressing, or signaling

information.

221. Plaintiffs and Class Members did not consent to Yahoo's installation of a pen register or trap and trace device on their devices and browsers.

222. Plaintiffs and Class Members have been harmed as a result of Yahoo's conduct. Yahoo did not have authorization to use pen registers and/or trap and trace devices to surveil and identify Plaintiffs and Class Members or other routing, addressing, and signaling information revealing who the intended recipients of their communications were.

223. Plaintiffs and Class Members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

224. Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

**SEVENTH CAUSE OF ACTION**
**Violation of the Comprehensive Computer Data Access and Fraud Act**
**Cal. Penal Code § 502 ("CDAFA")**
**On Behalf of the California Plaintiffs and Subclasses**

225. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

226. The California Legislature enacted CDAFA to "expand the degree of protection afforded . . . from tampering, interference, damage, and unauthorized access to ([including the extraction of data from)] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that

"protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

227. Plaintiffs' and Class Members' devices on which Yahoo's tracking technology is installed, including their computers, smart phones, and tablets, constitute "Computer system[s]" within the meaning of the CDAFA. *Id*. § 502(b)(5).

228. The data that Yahoo accessed and collected from Plaintiffs' and Class Members' devices constitutes "Data" within the meaning of the CDAFA. *Id*. § 502(b)(8).

229. Yahoo violated § 502(c)(1) of the CDAFA by knowingly accessing without permission Plaintiffs' and Class Members' devices in order to wrongfully obtain and use their personal data, in violation of users' reasonable expectations of privacy in their devices and data.

230. Yahoo violated § 502(c)(2) of the CDAFA by knowingly and without permission taking, copying, and making use of Plaintiffs' and the Class Members' unique identifiers and other personal data from their devices.

231. Plaintiffs' and the Class Members' device functionalities, device systems, device network, and browsers constitute "computer services" within the meaning of the CDAFA. Yahoo violated § 502(c)(3) by knowingly and without permission using those computer services, and/or causing them to be used through Yahoo's tracking technology and identifying mechanisms incorporated on third party websites and apps.

232. Plaintiffs' and the Class Members' devices, device systems, device network, and browsers constitute "computer, computer system, or computer network" within the meaning of the CDAFA. Yahoo violated § 502(c)(7) by knowingly and without permission accessing those devices, device systems, device networks, and browsers, and/or causing them to be accessed

through Yahoo's tracking technology and identifying mechanisms incorporated on third party websites and apps.

233. Yahoo violated §§ 502(c)(6) and (c)(13) of the CDAFA by knowingly, and without permission from Plaintiffs and the Class Members, providing and/or assisting in providing advertisers and owners of third party websites and apps with the ability to access Plaintiffs' and the Class Members' devices, device systems, device networks, and browsers through Yahoo's tracking technology and identifying mechanisms incorporated on third party websites and apps .

234. Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Yahoo's tracking technology and identifying mechanisms constitutes computer contaminants as defined by § 502(b)(12) of the CDAFA. Yahoo violated § 502(c)(8) by knowingly introducing computer contaminants, including its first-party cookies, to Plaintiffs' and the Class Members' devices, device systems, device networks, and browsers, which recorded and transmitted their PII and other private information to Yahoo. Yahoo also violated § 502(c)(8) by knowingly introducing computer contaminants, including its tag and pixel trackers, to third party websites and apps, which constitute "computer, computer system, or computer network" within the meaning of CDAFA. Yahoo's computer contaminants on third party websites and apps also recorded and transmitted Plaintiffs' and the Class Members' PII and other private information to Yahoo. As described *supra*, these tracking technologies are deeply hidden; Plaintiffs and Class Members had no way to remove them or opt out of their functionality.

235. Plaintiffs and Class Members suffered damage and loss as a result of Yahoo's conduct. Yahoo's practices have deprived Plaintiffs and the Class Members of control over their

valuable property (namely, their sensitive personal data), the ability to receive compensation for that data, and the ability to withhold their data for sale. Plaintiffs and Class Members suffered harm because Yahoo unjustly profited from the PII and private data Yahoo intercepted by using it for its own business purposes like training machine learning models and powering its RTB platforms. Yahoo's tracking technology has caused harm to Plaintiffs and Class Members by taking up additional bandwidth, CPU time, data usage, and power consumption in their devices. Yahoo's practices have also violated Plaintiffs' and Class Members' private interests by collecting and disclosing their PII and other private information.

236. Plaintiffs and the Class Members seek compensatory damages in accordance with CDAFA § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

237. Plaintiffs and Class Members have also suffered irreparable and incalculable harm and injuries from Yahoo's violations. The harm will continue unless Yahoo is enjoined from further violations of this section. Plaintiffs and Class Members have no adequate remedy at law.

238. Plaintiffs and the Class Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Yahoo's violations were willful and, upon information and belief, Yahoo is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiffs and the Class Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

**EIGHTH CAUSE OF ACTION**
**Unjust Enrichment**
**On Behalf of the Plaintiffs and Classes**

239. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

240. Yahoo receives benefits from Plaintiffs and Class Members in the form of their

unique identifiers and other personal data and private online communications. Yahoo acquired this information without Plaintiffs' and Class Members' authorization and without providing corresponding compensation.

241. Yahoo acquired and used this private data for its own benefit, including tangible economic benefits from companies that used Yahoo for targeted advertising.

242. Had Plaintiffs and Class Members known of Yahoo's misconduct, they would not have agreed that Yahoo could acquire and use their private data.

243. Yahoo unjustly retained these benefits at the expense of Plaintiffs and Class Members. Plaintiffs and Class Members were harmed by this conduct and were not provided any commensurate compensation.

244. The benefits Yahoo received and derived from Plaintiffs' and Class Members' private data rightly belong to Plaintiffs and Class Members. It is inequitable under unjust enrichment principles for Yahoo to retain the profits and other intangible benefits derived through its wrongful conduct.

245. Yahoo should be compelled to disgorge these profits and other inequitable proceeds in a common fund for the benefit of Plaintiffs and Class Members.

## NINTH CAUSE OF ACTION
**Injunctive Relief**
**On Behalf of the Plaintiffs and Classes**

246. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

247. Yahoo's conduct has caused and continues to cause harm to Plaintiffs' and Class Members' privacy and autonomy, as it continues to store unique persistent identifiers, as well as the private contents of their communications, on its own systems. Yahoo routinely uses this

information for targeted advertising.

248. Accordingly, Plaintiffs and Class Members seek injunctive relief, including an order permanently restraining Yahoo from continuing to use and store this information without consent and/or a court order, and requiring Yahoo to delete this information from its systems.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and the putative Classes request the Court enter an Order:

a. Certifying the Classes and appointing Plaintiffs as Class Representatives;

b. Finding Yahoo's conduct unlawful;

c. Awarding injunctive and other equitable relief as is just and proper;

d. Awarding Plaintiffs and the Classes statutory, actual, compensatory, punitive, nominal, and other damages, as well as restitution and/or disgorgement of unjust and unlawful profits;

e. Awarding pre-judgment and post-judgment interest;

f. Awarding reasonable attorneys' fees, costs, and expenses; and

g. Granting any other relief as the Court sees just and proper.

Dated: December 3, 2025

*/s/ Christian Levis*

Christian Levis
Amanda Fiorilla
Rachel Kesten
Yuanchen Lu
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com
ylu@lowey.com

Vicki J. Maniatis (NY Bar No. 2578896)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
405 East 50th Street
New York, NY 10022
Tel.: (516) 491-4665
vmaniatis@milberg.com

Charles E. Schaffer (*pro hac vice*)
Nicholas J. Elia *
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
cschaffer@lfsblaw.com
nelia@lfsblaw.com

Brett Cohen *
**LEEDS BROWN LAW, P.C.**
One Old Country Road, Suite 347
Carle Place, NY 11514
Tel: (516) 268-3579
bcohen@leedsbrownlaw.com

Jeffrey S. Goldenberg (*pro hac vice*)
**GOLDENBERG SCHNEIDER, LPA**
4445 Lake Forest Drive, Suite 490
Cincinnati, Ohio 45242
Phone: (513) 345-8291
Facsimile: (513) 345-8294
jgoldenberg@gs-legal.com

* *Pro hac vice* forthcoming